UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-60198-CR-UNGARO/HUNT

UNITED STATES OF AMERICA,
    Plaintiff,

v.

JERMAINE WILLIAMS,
    Defendant.
_____/

**DEFENDANT'S OBJECTIONS TO
THE REPORT AND RECOMMENDATION**

COMES NOW, the Defendant, JERMAINE WILLIAMS, through undersigned counsel, and respectfully submits his Objections to the Magistrate Judge's Report and Recommendation (R&R). (DE 32). In support, Mr. Williams states the following:

### I.    INTRODUCTION

In the early evening of October 4, 2018, officers from the Violence Intervention Pro-Active Response ("VIPER") Unit were conducting surveillance in Pompano Beach, Florida. While there, VIPER officers were provided information from a known source that a person he knew to sell drugs and carry a firearm was in the neighborhood in a blue Buick. Significantly, the source *did not* inform the officers that this person was presently selling drugs or presently armed – only that he was known to sell drugs and carry a gun. The VIPER officers immediately began driving around the area. Shortly thereafter, VIPER officers noticed a blue Buick lawfully parked in a designated parking spot in front of an apartment building at 340 SW 2nd Place, Pompano Beach, Florida.

At the suppression hearing, the lead detective in the case, Detective Brown, testified that as the officers drove past the Buick, he observed Mr. Williams and a female interacting at the driver side door of the Buick. Detective Brown, however, further testified that he did not see an exchange of money for drugs and admitted that the conduct could have been innocent behavior.[1] By the time the officers stopped their vehicle, Mr. Williams was standing - not running or fleeing - in the street some 10-15 feet away from the car. The VIPER officers parked their car, exited the vehicle and *immediately* seized and handcuffed Mr. Williams as he stood in the street. At the hearing, Detective Brown also testified that at that moment, Mr. Williams was being detained pending further investigation and *not* under arrest. Before the handcuffs were actually on Mr. Williams, and without delay, discussion or legal justification, another officer, Detective Zamora, approached the Buick, opened the driver-side door and searched the vehicle. *See* Government's Exhibit 5, Detective Viera's body worn camera #4120 at :34 - :40. During the search of the vehicle VIPER officers discovered a gun, narcotics, and cash.

At the hearing, the government introduced body camera footage of the incident and called two witnesses: Detective Brown and Detective Viera. Significantly, the government did not call Detective Zamora to testify. Detective Zamora was the officer who first made entry into the vehicle and searched the vehicle. Instead the government argued, without any testimony from Detective Zamora, that Detective

---

[1] A second officer (Detective Viera) testified at the hearing that he observed what he believed was a hand-to-hand transaction. However, at the hearing he could not provide details about what was exchanged between Mr. Williams and the female and did not author any police reports in the case.

Zamora smelled marijuana coming from the car, which had all doors closed and windows up.

To support their argument the government relied on a clip from Detective Zamora's body worn camera, in which he stated to another officer, "you smell the weed when we roll back on the vehicle" and "yeah we smelled…when we rolled up on the vehicle." *See* Government's Exhibit 5, Detective Zamora's body worn camera #0129 at 3:21 - 3:25. However, as the videos show, Detective Zamora only engaged his body worn camera well <u>after</u> he had entered and searched the car and at least three minutes after the officers first approached Mr. Williams.

According to Detective Viera's body worn camera, Detective Zamora made these statements at least two minutes and thirty seconds after Detective Zamora searched the car. In fact, by the time Detective Brown had entered the car, Detective Zamora had already been searching the car for approximately thirty seven seconds and had located drugs in the car and was placing recovered items on the roof of the car. *See* Government Exhibit 5, Detective Viera's body worn camera #4120 at: 34 – 1:13.

While VIPER officers conducted the search of the vehicle, Mr. Williams was ordered to sit on the hood of the vehicle.  Mr. Williams was not free to leave. While Mr. Williams was handcuffed and seated on the hood of the car, VIPER officers repeatedly asked Mr. Williams questions they reasonably knew would elicit incriminating responses.  At no time was Mr. Williams advised of his *Miranda* rights. All of these events were captured on the officers' body worn cameras

Ultimately, Mr. Williams was charged in state court with *possession* with intent to sell narcotics and simple *possession* of narcotics. Importantly, Mr. Williams was not arrested for or charged with sale of narcotics. Additionally, although he was arrested for possession of a firearm by a convicted felon, the Broward State Attorney's Office declined to prosecute Mr. Williams for that offense. On January 16, 2019, Mr. Williams pled guilty to the drug charges and received a sentence of five (5) years of probation.

On July 11, 2019, a one-count Indictment was filed in this case charging Mr. Williams with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). (DE 1). Although not alleged in the Indictment, the parties expect that Mr. Williams will qualify as an armed career criminal pursuant to 18 U.S.C. § 924(e), and be subject to a 15-year minimum mandatory sentence if convicted.

On December 13, 2019, Mr. Williams filed his Motion to Suppress Evidence and Statements. (DE 19). On January 15, 2020, Magistrate Judge Patrick Hunt held an evidentiary hearing on Mr. Williams' motion to suppress. (DE 31). On January 31, 2020, Magistrate Hunt issued his Report and Recommendation. (DE 32). In making its recommendation to deny Mr. Williams' motion to suppress, the Report concludes that "detectives had the right to make an investigatory stop and then had probable cause to search the car." For the reasons set forth below, Mr. Williams objects to the findings of fact and conclusions of law set forth in the R&R.

## II. ARGUMENT

A.  **The Magistrate Erred in Finding the Search was Lawful.**

Mr. Williams objects to the Magistrate's conclusion that the search of the car was lawful because the officers smelled marijuana coming from the car; because the car's windows were tinted; and because the search of the car was incident to Mr. Williams' arrest.

1.  **The Magistrate erred in finding that the smell of marijuana establish probable cause to search the car**.

Detective Brown was the only officer who testified at the hearing that he smelled marijuana. And, by that time (based on the body camera footage), Detective Zamora was **already** searching the car from the driver side. In fact, Detective Zamora had already been in the car for thirty seven seconds when Detective Brown approached the car. Furthermore, while true that Detective Zamora can be heard on his body camera stating he smelled marijuana, this is not contemporaneous with him approaching the car and is much later in time and *after* the car had been searched and marijuana had been found in the car. In fact, there is only one body camera footage from Detective Zamora and he only engaged his camera *after* the initial search of the car - some three minutes after the officers arrived on the scene.

Because the government failed to call the only witness who was in a position to testify about what he smelled and when he smelled it - before the car was searched - the Court should reject the smell of marijuana as a basis to establish probable cause to search the car.

> **2.     The Magistrate erred in relying on traffic stop cases in support of its position that police officers were justified in searching the vehicle because the car's windows were tinted.**

In its Report, the Magistrate relied on *United States v. Stanfield*, 109 F.3d 976 (4th Cir. 1997), in support of its position that the police were authorized to search the car because the windows were tinted. *See* R&R at p. 10. In this Fourth Circuit case, police officers conducted a traffic stop of Nissan Pathfinder that was blocking traffic in the middle of the street. When the officers approached the car, they could not see into the passenger side of the car because of the heavy tints on the windows. Because they could not see into the car, the officers opened the door "in order to determine whether Stanfield was armed or had access to weapons and whether he was alone in the Pathfinder." *Id*. at 978. When the officer looked in, he saw cocaine in plain view.

In rejecting Stanfield's argument that opening the door violated the Fourth Amendment, the Fourth Circuit explained in great detail the inherent dangers involved when police officers approach people seated in automobiles. Relying exclusively on traffic stop cases, the Court held that "during a lawful traffic stop, officers are required to approach a vehicle with windows so heavily tinted that they are unable to view the interior of the stopped vehicle, they may, when it appears in their experienced judgment prudent to do so, open at least one of the vehicle's doors and, without crossing the plane of the vehicle, visually inspect its interior in order to ascertain whether the driver is armed, whether he has access to weapons, or whether there are other occupants of the vehicle who might pose a danger to the officers." *Id*. at 981. Although the Court found that there was no Fourth Amendment violation, it

made clear that this "protective sweep" was for the limited purpose "of determining whether Stanfield was armed and whether there were any other occupants within the vehicle who might pose a danger to him or his partners." *Id.* at 989.

In this case, Mr. Williams was not detained pursuant to a traffic stop. By all accounts, including the body camera footage, Mr. Williams was in the street some 10-15 away from the car when he was detained by law enforcement. It is also clear from the testimony and videos that none of the officers were concerned for their safety or had any fear or concern that someone else was in the car or that Mr. Williams was armed. In fact, when they approached they did so in a calm manner without firearms drawn. They simply exited their car and casually approached Mr. Williams. Put simply, the actions of the officers and the body camera footage belie any argument that they only opened the door to determine if any armed occupant was in the car.

Furthermore, because the initial officer who entered the car (Detective Zamora) failed to testify at the hearing, this Court is left without any testimony regarding whether *he* could see into the car, whether *he* believed someone else was in the car, and whether *he* believed that person may be armed. Again, by the time Detective Brown (who did testify at the hearing) entered the passenger-side of the car, Detective Zamora was already searching the car. By this point, Detective Brown clearly knew there was no one else in the car who could pose a danger to him or the other officers. Because of this, he had no legal justification to open the door.

It should also be noted that Detective Zamora's entry into the car was not the limited "protective sweep" contemplated in *Stanfield*. This was not a quick look into

7

the car to determine if anyone else was in the car. This was a full-blown search. For these reasons, this Court should reject the Magistrate's finding that tinted windows provided police officers with probable cause to search the car.

### 3. The Magistrate Erred in Finding that the Search of the Car was Justified Based on a Search Incident to a Valid Arrest.

In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court authorized vehicle searches when "the arrestee is within reaching distance of the passenger compartment at the time of the search," or when "it is reasonable to believe the vehicle contains evidence of the offense of arrest." Here, neither prong of *Gant* applies.

First, when the search was conducted, Mr. Williams was handcuffed some 10-15 from the car. This was after Mr. Williams was encountered by the police standing in the middle of the street. This was not a traffic stop case where Mr. Williams was found in the car and then ordered out. Put simply, he was not within reaching distance of the car.

Second, at the time of the search, Detective Brown testified, consistent with his reports, that Mr. Williams was not under arrest. He was detained pending further investigation. And, this is consistent with all of the evidence introduced at the hearing. According to Detective Brown's testimony at the hearing, although he saw Mr. Williams and a woman talking at the driver side door of the car, he could not determine if a crime had been committed. In fact, he admitted on cross-examination that what he saw could have been anything. Including innocent behavior. So, at that point, he had no legal basis to arrest Mr. Williams for anything. At best, he could

detain Mr. Williams.  However, at that very moment - even before Mr. Williams was actually cuffed and fully detained - Detective Zamora can be seen in the background of Detective Viera's body camera entering and searching the vehicle.  In fact, only thirty six seconds had elapsed since the officers exited their vehicle.

The Magistrate's Report mentions in a footnote that at some point the detention became an arrest and that "based on the totality of circumstances, the detectives had probable cause to arrest Williams for sale of marijuana."  However, this rationale (and timeline of events) is flawed.  There is no dispute that at the time the car was searched by Detective Zamora, Mr. Williams was merely detained.  In fact, he could not have been under arrest for any crime.  This is true because at that point in the investigation, the officers had not discovered any drugs – let alone marijuana.  And, despite having there with them at the scene the alleged buyer (the female they observed at the car door), no one asked her any questions, detained or searched her.  The police simply allowed her to walk away from the scene. So, at the point the car was searched, Mr. Williams was not under lawful arrest for any crime.

For these reasons, this Court should reject the Magistrate's finding that the holding in *Gant* provided the officers with a legal basis to search the car.

**B.     The Magistrate Erred in Finding Mr. Williams' Statements were not made in Response to Custodial Interrogation.**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  This protects individuals not only from legal compulsion to testify in a criminal courtroom, but also from "informal compulsion exerted by law-enforcement officers during in-custody

9

questioning." *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S.Ct. 1602, 1620-21 (1966). Police interrogation, for *Miranda* purposes, refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1689-90 (1980). The inquiry focuses primarily on the perceptions of the suspect, rather than the intent of the police. *Id.* at 301, 100 S. Ct. at 1690. In determining whether a person is "in custody" under *Miranda*, the inquiry is whether "there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121 (1983).

Here, because Mr. Williams was subject to custodial interrogation without the benefit of *Miranda* warnings, his statements to police must be suppressed. First, Mr. Williams was clearly "in custody" for *Miranda* purposes. Within seconds of the police arriving on the scene, he was handcuffed and ordered to sit on the vehicle's hood. Throughout the search of the vehicle and until he was placed inside a police car, armed police officers stood in front of him – further reinforcing the idea that he was *not* free to leave. Because Mr. Williams' freedom of movement was restricted to such a degree associated with formal arrest, he was in custody for Fifth Amendment purposes.

Second, the police initiated questioning of Mr. Williams *knowing* it was reasonably likely to elicit an incriminating response. For example, the police questioned Mr. Williams about his prior criminal history, whether he was on

10

probation, and why he was on probation. These questions led to Mr. Williams making incriminating statements. Because the statements were made during custodial interrogation and in violation of *Miranda*, they must be excluded.

WHEREFORE, for the reasons set forth above, Mr. Williams respectfully requests that this Court grant his objections and grant his Motion to Suppress.

                Respectfully submitted,

                MICHAEL CARUSO
                FEDERAL PUBLIC DEFENDER

       By:   */s/ Joaquin Padilla*
                Assistant Federal Public Defender
                Florida Bar No.: 484636
                150 W. Flagler Street, Suite 1500
                Miami, Florida 33130-1556
                Tel: (305) 533-4255/Fax: (305) 536-4559
                E-mail: joaquin_padilla@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 7, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                */s/ Joaquin Padilla*